**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

United States Courts
Southern District of Texas
ENTERED

OCT 1 7 2007

~~Michael N. Milby, Clerk of Court~~

| | |
|---|---|
| IN THE MATTER OF THE | § |
| APPLICATION OF THE UNITED | § |
| STATES OF AMERICA FOR AN | § |
| ORDER: (1) AUTHORIZING THE | § |
| INSTALLATION AND USE OF A | § |
| PEN REGISTER AND TRAP AND | §   MISC. CASE NO. H-07-613 |
| TRACE DEVICE, AND | § |
| (2) AUTHORIZING RELEASE OF | § |
| SUBSCRIBER AND OTHER | § |
| INFORMATION | § |

## MEMORANDUM AND OPINION

The United States of America has filed two *ex parte* applications for orders authorizing the installation and use of a pen register and trap-and-trace device. The magistrate judge granted the Government's requests in part and denied them in part. Specifically, Magistrate Judge Smith granted the request for a pen register and trap-and trace device but denied access to cell-site information and post-cut-through dialed digits.[1]

---

[1]     The Government's applications provide definitions of "cell-site information," "call-detail records," and "post-cut-through dialed digits." "Cell-site information" is defined as the antenna tower and sector to which the cell phone sends its signal, including the physical location and/or address of the cellular tower and of the particular sector of the tower receiving the signal. (Docket Entry No. 1 at 2 n.3; Docket Entry No. 2 at 2 n.3). "Call-detail records" are defined in the applications as "similar to toll records (i.e. historical telephone records of telephone activity, usually listing outgoing calls and date, time, and duration of each call), which are made and retained in the ordinary course of business." (Docket Entry No. 1 at 2 n.4; Docket Entry No. 2 at 2 n.4). "Call-detail records" are toll records of mobile telephones rather than hardline telephones. (Docket Entry No. 1 at 2 n.4; Docket Entry No. 2 at 2 n.4). "Unlike toll records, however, call detail records also include a record of incoming calls and the cellsite/sector(s) used by the mobile telephone to obtain service for a call or when in an idle state." (Docket Entry No. 1 at 2 n.4; Docket Entry No. 2 at 2 n.4). The final term, "post-cut-through dialed digits," is defined in the applications as "any digits that are dialed from the Target Device[s] after the initial call setup is completed." (Docket Entry No. 1 at 4 n.6; Docket Entry No. 2 at 4 n.6). "[S]ome post-cut-through dialed digits are telephone numbers, such as when a subject places a calling card, credit card, or collect call by first dialing a long-distance carrier access number and then, after the initial call is 'cut through,' dialing the telephone number of the destination party." (Docket Entry No. 1 at 4 n.6; Docket Entry No. 2 at 4 n.6). The applications state that post-cut-through

5

Magistrate judges and district judges have divided over the Government's ability to obtain such data by way of a pen-register application and order.[2]  The courts and the Government would all benefit from additional case-law development.  As one judge has noted, the best way to test the limit of the Government's authority may be through developed records, trial court opinions on suppression motions, and appellate review.  *See In re Applications of the United States of Am. for Orders Pursuant to Title 18, United States Code, Section 2703(d)*, __ F. Supp. 2d __, No. MBD-07-10192-RGS, 2007 WL 2697070, at *3 (D. Mass. Sept. 17, 2007).

Some of the issues discussed in these cases and raised by the Government's applications are addressed below.

## I.    The Applications

---

dialed digits "also can represent call content, such as when subjects call automated banking services and enter account numbers, or call voicemail systems and enter passwords, or call pagers and dial call-back telephone numbers (which are considered numeric messages)." (Docket Entry No. 1 at 4–5 n.6; Docket Entry No. 2 at 4–5 n.6).

[2]    *See, e.g., In the Matter of Applications of the United States of Am. for Orders (1) Authorizing the Use of Pen Registers and Trap and Trace Devices and (2) Authorizing Release of Subscriber Information*, Nos. 06MISC.547 (JMA), 06 MISC.561 (JMA), 07MISC.120 (JMA), __ F. Supp. 2d __, 2007 WL 2729668 (E.D.N.Y. Sept. 18, 2007) (hereinafter *E.D.N.Y. Case*) (disallowing access to post-cut-through dialed digits through a pen register order); *In the Matter of the Application of the United States of Am. for an Order Authorizing the Installation and Use of a Pen Register Device, a Trap and Trace Device, and for Geographic Location Info.*, 497 F. Supp. 2d 301 (D.P.R. 2007) (denying access to cell-site information); *In re: Application of the United States for an Order for Prospective Cell Site Location Info. on a Certain Cellular Tel.*, 460 F. Supp. 2d 448 (S.D.N.Y. 2006) (allowing access to certain cell-site information); *In the Matter of the Application of the United States of Am. for an Order Authorizing (1) Installation and Use of a Pen Register and Trap and Trace Device or Process, (2) Access to Customer Records, and (3) Cell Phone Tracking*, 441 F. Supp. 2d 816 (S.D. Tex. 2006) (denying a request for cell-site information and post-cut-through dialed digits); *In the Matter of the Application of the United States for an Order: (1) Authorizing the Installation and Use of a Pen Register and Trap and Trace Device; and (2) Authorizing Release of Subscriber Info. and/or Cell Site Info.*, 411 F. Supp. 2d 678 (W.D. La. 2006) (permitting access to certain cell-site information).

The Government filed two *ex parte* applications for orders authorizing the installation and use of a pen register and trap-and-trace device with respect to two separate phone numbers (the "Target Devices").  The applications requested orders directing the Target Devices' service providers to disclose to or to provide on demand by Drug Enforcement Administration (the "Investigative Agency") agents both historical information and prospective information.  The applications seek:  (1) "[f]or the Target Device[s], records or other information pertaining to subscriber(s) or customer(s), including historical cell site information and call detail records (including in two-way radio feature mode)" for sixty days before the date of the order; and (2) "[f]or the Target Device[s], after receipt and storage, records or other information pertaining to subscriber(s) or customer(s), including the means and source of payment for the service and cell site information, provided to the United States on a continuous basis for (a) the origination of a call from the Target Device[s] or the answer of a call to the Target Device[s], (b) the termination of the call and (c) if reasonably available, during the progress of the call . . . ." (Docket Entry No. 1 at 2–3; Docket Entry No. 2 at 2–3).  The applications appear to request real-time or prospective cell-site information, at the beginning and end of calls made or received on the Target Devices, as well as cell-site information for the duration of the calls if reasonably available.

The applications request a variety of other subscriber records and other information relating to certain information captured by the pen registers and trap-and-trace devices on the Target Devices, as well as disclosure of changes in service regarding the Target Devices.

3

The applications also ask the court to authorize the Investigative Agency to install, or cause the provider to install, and to use a pen-register device that would record dialing, routing, addressing, or signaling information (including post-cut-through dialed digits) transmitted from the Target Devices, to record the date and time of the dialings and to record the length of time the phone receiver is "off the hook," for a period of sixty days.

Additionally, the Government requests that the Investigative Agency be permitted to install, or cause the provider to install, and use, a trap-and-trace device on the Target Devices anywhere in the United States. The trap-and-trace device is to capture and record the incoming electronic and other impulses that identify the originating numbers or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication and to record the date, time, and duration of calls created by such incoming impulses, for sixty days. The Government asserts that to the extent that additional digits received are the content of a call as opposed to the number called, this information will not be used for any investigative purpose.

The Government bases these requests on 18 U.S.C. §§ 2703(c), 2703(d), 3122, and 3123 and 47 U.S.C. § 1002. According to the Government, Magistrate Judge Smith signed an order authorizing a pen register and trap-and-trace device, but not for cell-site information or post-cut-through dialed digits. The Government has in effect asked this court for a more expansive order based on the same applications, permitting the Government to collect all the information sought, including cell-site information and post-cut-through dialed digits.

## II.   Cell-Site Information

The Pen Register Statute states that a court is to issue an order authorizing the installation and use of a pen register or trap-and-trace device if an application filed by an attorney for the Government certifies that "information likely to be obtained by such installation and use is relevant to an ongoing criminal investigation." 18 U.S.C. § 3123(a)(1). The Stored Communications Act further requires that the Government provide "specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). This court has reviewed the Government's sealed applications and finds that the Government has met its statutory burdens under 18 U.S.C.§ 3121 *et seq.* and § 2703(d). The threshold issue is whether cell-site information may be obtained under the Pen Register Statute and the Stored Communications Act, or whether the Government must make a higher showing of probable cause.

A "pen register" is defined in the statute as "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, provided, however, that such information shall not include the contents of any communication . . . ." 18 U.S.C. § 3127(3). Cell-site data is "signaling information" within the scope of a pen register. *See In re: Application of the United States for an Order for Prospective Cell Site Location Info.*

*on a Certain Cellular Tel.*, 460 F. Supp. 2d at 455–56 ("[T]he Court presumes that Congress knew—when it added the term 'signaling information' to the definitions of penregisters and trap and trace devices in 2001—that the D.C. Circuit had interpreted that term to include cellsite information in the *United States Telecom Association* decision a year earlier.").

As noted, the courts have divided over the statutory authority for the information the Government seeks.  Courts refusing to issue orders authorizing cell-site information on applications similar to the ones filed in this case have focused on a statement in the Communications Assistance to Law Enforcement Act ("CALEA") restricting access to information about a subscriber's location obtained "solely pursuant" to a pen register order, as well as the absence of explicit standards in the separate statutes the Government invokes to authorize access to cell-site information, 18 U.S.C. §§ 3121–27 (the Pen Register Statute) and 18 U.S.C. § 2703 (the Stored Communications Act).  These courts have also expressed concern that the Government might use the information to make a cell phone a "tracking device."  These courts cite congressional testimony from the former director of the Federal Bureau of Investigation about certain aspects of the PATRIOT Act that purportedly limited the use of the statutes at issue for cell-phone monitoring applications.  These cases find that the applicable standard is probable cause and that the Government has not made this showing, then refuse to issue the authorization.[3]

---

[3]     *See In the Matter of the Application of the United States of Am. for an Order: (1) Authorizing the Installation and Use of a Pen Register and Trap and Trace Device, and (2) Authorizing Release of Subscriber and Other Info.*, 433 F. Supp. 2d 804, 804–05 (S.D. Tex. 2006) ("*S.D. Tex. I*") (collecting cases, including *In re Application of the United States for an Order for Prospective Cell Site Location Info. on a*

Other courts have granted the Government's applications requesting cell-site information.[4] This court has summarized the position of courts accepting the Government's applications under the Pen Register Statute and the Stored Communications Act, as follows:

> Judges accepting these applications have focused on the explicit text of the statutes, which states that cell-site information may not be obtained "solely pursuant" to the Pen Register Statute, [citing] 47 U.S.C. § 1002(a)(2). These courts permit the government to obtain cell-site information after meeting the requirements of both the Pen Register Statute and 18 U.S.C. § 2703(c)(1), which allows the government to obtain customer records from "electronic communication providers." These courts point out that Section 2703 meets the purpose of the Section 1002 exception, to require more than the minimal authorization imposed under the Pen Register Statute, but does not require a probable-cause showing. In many of these cases, moreover, the judges ensured that the orders authorized only limited information, minimizing the concern that a cell phone could be used as a kind of "tracking device."

---

*Certain Cellular Tel.*, No. 06 CRIM MISC. 01, 2006 WL 468300 (S.D.N.Y. Feb. 28, 2006); *In re Application of the United States of Am. for Orders Authorizing the Installation and Use of Pen Registers and Caller Identification Devices on Tel. Nos. [Sealed] and [Sealed]*, 416 F. Supp. 2d 390 (D. Md. 2006); *In re the Application of the United States of Am. for an Order Authorizing the Installation and Use of a Pen Register and/or Trap and Trace for Mobile Identification No. (585) 111-1111 and the Disclosure of Subscriber and Activity Info. Under 18 U.S.C. § 2703*, 415 F. Supp. 2d 211 (W.D.N.Y. 2006); *In the Matter of the Application of the United States of Am. for an Order Authorizing the Disclosure of Prospective Cell Site Info.*, 412 F. Supp. 2d 947 (E.D. Wis. 2006); *In the Matter of the Application of the United States of Am. for an Order Authorizing the Release of Prospective Cell Site Info.*, 407 F. Supp. 2d 132 (D.D.C. 2005); *In the Matter of the Application of the United States of Am. for an Order (1) Authorizing the Installation and Use of a Pen Register and Trap and Trace Device and (2) Authorizing Release of Subscriber Info. and/or Cell Site Info.*, 396 F. Supp. 2d 294 (E.D.N.Y. 2005); *In re Application for Pen Register and Trap/Trace Device With Cell Site Location and Auth.*, 396 F. Supp. 2d 747 (S.D. Tex. 2005)).

[4]  *See S.D. Tex I*, 433 F. Supp. 2d at 805 (collecting cases, including *In the Matter of the Application of the United States for an Order: (1) Authorizing the Installation and Use of a Pen Register and Trap and Trace Device; and (2) Authorizing Release of Subscriber Info. and/or Cell Site Info.*, 411 F. Supp. 2d 678 (W.D. La. 2006); *In re Application of the United States of Am. for an Order for Disclosure of Telecomms. Records and Authorizing the Use of a Pen Register and Trap and Trace*, 405 F. Supp. 2d 435 (S.D.N.Y. 2005)).

*Id.* at 805–06.

In a previous opinion, this court concluded that the analysis used in the opinions issued by the Southern District of New York and the Western District of Louisiana were persuasive and that the relevant facts of those cases were most similar to the facts of the case at hand. *S.D. Tex. I*, 433 F. Supp. 2d at 806. This court specifically noted that in cases in which courts granted the applications, the Government was not seeking: "(1) to activate remotely the subject telephone's GPS functionality; (2) to obtain information from multiple cellular antenna towers simultaneously to 'triangulate' the precise location of a cell phone; or (3) to place calls to a particular cell phone repeatedly or otherwise to track on a continuous basis the location of a cell phone when no call is being placed or received." *Id.*

In the past year, several other courts have considered applications for pen registers that included requests for cell-site information. Some of the recent cases have granted the Government's request.[5] In contrast, other courts recently considering the issue of the availability of cell-site data have followed the trend of denying the Government's requests.[6]

_____

[5]      *See, e.g., In re Applications of the United States of Am. for Orders Pursuant to Title 18, United States Code, Section 2703(d)*, 2007 WL 2697070, at *2 (finding that historical cell site information was obtainable upon a showing of "specific and articulable facts" under the Stored Communications Act); *In re Application for an Order Authorizing the Extension and Use of a Pen Register Device etc.*, No. 07-SW-034 GGH, 2007 WL 397129, at *1–2 (E.D. Cal. Feb. 1, 2007) (noting that the court's analysis in a previous order had determined that the Stored Communications Act, the Pen Register Statute, and CALEA permitted cell-site location information to be disclosed upon an order issued without a showing of probable cause and finding that the 2006 amendments to FED. R. CRIM. P. 41 did not change this result); *In re: Application of the United States for an Order for Prospective Cell Site Location Info. on a Certain Cellular Tel.*, 460 F. Supp. 2d at 461 (approving a request for cell-site information where the cell-site information would come from only one tower).

[6]      *See, e.g., In the Matter of the Application of the United States of Am. for an Order Authorizing the Installation and Use of a Pen Register Device, a Trap and Trace Device, and for Geographic*

8

Most authorities agree that the Pen Register statute permits collection of cell-site data, absent countervailing authority. *In the Matter of the Application of the United States of Am. for an Order Authorizing the Installation and Use of a Pen Register Device, a Trap and Trace Device, and for Geographic Location Info.*, 497 F. Supp. 2d at 306. In describing the duty of a telecommunications carrier to ensure that its equipment, facilities, or services meet certain requirements, CALEA contains a limitation that "with regard to information acquired *solely pursuant* to the authority for pen registers and trap and trace devices . . . , such call-identifying information shall not include any information that may disclose the physical location of the subscriber (except to the extent that the location may be determined from the telephone number)." 47 U.S.C. § 1002(a) (emphasis added). A number of courts have concluded that this CALEA provision restricts an order for a pen register that would provide cell-site information unless the Government satisfies the requirements not only under the Pen Register statute but under other statutory authority as well. This interpretation gives effect to the "solely pursuant" language in CALEA. *See In re: Application of the United States for an Order for Prospective Cell Site Location Info. on a Certain Cellular Tel.*, 460 F. Supp. 2d at 458 (allowing access to certain cell-site information and stating that "[a]bsent any such

---

*Location Info.*, 497 F. Supp. 2d 301 (D.P.R. 2007) (finding that the Pen Register Statute combined with the Stored Communications Act did not authorize the disclosure of cell-site information); *In Matter of Application for an Order Authorizing the Installation and Use of a Pen Register and Directing the Disclosure of Telecomms. Records for the Cellular Phone Assigned the Number [Sealed]*, 439 F. Supp. 2d 456 (D. Md. 2006) (denying a request for prospective cell-site data without a sworn affidavit showing probable cause); *In the Matter of the Application of the United States of Am. for an Order Authorizing (1) Installation and Use of a Pen Register and Trap and Trace Device or Process, (2) Access to Customer Records, and (3) Cell Phone Tracking*, 441 F. Supp. 2d 816 (S.D. Tex. 2006) (denying a request for cell-site data based on a request under the Pen Register Statute and the Stored Communications Act).

expression [preventing disclosure of cell-site information under the Pen Register Statute even with additional statutory authority] in the statutory text, the Court declines to ignore the word 'solely' and its implications in the context of Section 1002."); *In re Application of the United States of Am. for an Order for Disclosure of Telecomms. Records and Authorizing the Use of a Pen Register and Trap and Trace*, 405 F. Supp. 2d at 443, 448–49 (granting access to cell-site information through the Pen Register Statute combined with the Stored Communications Act); *accord In the Matter of the Application of the United States for an Order: (1) Authorizing the Installation and Use of a Pen Register and Trap and Trace Device; and (2) Authorizing Release of Subscriber Information and/or Cell Site Information*, 411 F. Supp. 2d at 680 (allowing access to certain cell-site information after agreeing with the statutory analysis used by Judge Gorenstein in the Southern District of New York).

In the applications under consideration, the Government appears to rely on the additional statutory authority found in the Stored Communications Act. Section 2703(c) provides that "[a] governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications)," by, among other options, obtaining a court order pursuant to subsection (d). 18 U.S.C. § 2703(c)(1). Courts have held that cell phone providers fit within the definition of "provider of electronic communication service." *See In re: Application of the United States for an Order for Prospective Cell Site Location Info. on a Certain Cellular Tel.*, 460 F. Supp. 2d

at 459. Both historical and prospective cell-site data are "a record or other information pertaining to a subscriber to or customer of" an electronic communications service. *See id.* at 459–60. Under this approach, the Government may obtain certain cell-site information under the Pen Register Statute and the Stored Communications Act if, as here, it makes the showing required under both statutes.

In this case, the Government has requested historical cell-site information and call-detail records that would include records of incoming calls and the cell site/sector(s) used by the phone to obtain service for a call or when the phone is in an idle state. The government has also requested prospective cell-site information for: (1) the origination of a call from the Target Device(s) or the answer of a call to the Target Device(s); (2) the termination of the call; and (3) if reasonably available, during the progress of the call, but not including the contents of communications. These requests are limited in important respects. The Government does not seek to activate GPS on the phone, to obtain information from multiple antenna towers, or to place calls to a particular cell phone repeatedly or otherwise continuously track movements when no call is being placed. Courts that have granted access to certain cell-site information have emphasized the limited scope of the Government's requests. For example, the Southern District of New York permitted disclosure of prospective cell-site information, emphasizing that the Government did not seek triangulation information or location information other than what was transmitted at the beginning and end of particular calls. *See In re: Application of the United States for an Order for Prospective*

11

*Cell Site Location Info. on a Certain Cellular Tel.*, 460 F. Supp. 2d at 461. Similarly, the Western District of Louisiana held that the Government could get the following prospective cell-site information: "(1) information regarding cell site location that consists of the tower receiving transmissions from the target phone; (2) tower information that is tied to a particular call made or received by the cell phone user; and (3) information that is transmitted from the cell phone service provider to the Government," but could not get "(1) any cell site information that might be available when the user's cell phone was turned 'on' but a call was *not* in progress; (2) information that would allow the Government to triangulate multiple tower locations and thereby pinpoint the location of the user; and (3) GPS information on the location of the user, even if that technology is built into the user's cell phone." *In the Matter of the Application of the United States for an Order: (1) Authorizing the Installation and Use of a Pen Register and Trap and Trace Device; and (2) Authorizing Release of Subscriber Info. and/or Cell Site Info.*, 411 F. Supp. 2d at 682–83 (emphasis in original).

In this case, the Government's request for historical cell-site information is within the statutory authorization. *See In re Applications of the United States of Am. for Orders Pursuant to Title 18, United States Code, Section 2703(d)*, 2007 WL 2697070, at *2 (finding that historical cell-site information was available upon a showing of "specific and articulable facts" under the Stored Communications Act); *In re Application for Pen Register and Trap/Trace Device With Cell Site Location Auth.*, 396 F. Supp. 2d 747, 759 n.16 (S.D. Tex. 2005) (finding that historical cell-site information likely fits within the Stored

12

Communications Act).   The Government's request for limited prospective cell-site information is within the scope of what this court has previously permitted by way of a pen register order. The Government only seeks cell-site information from a single tower.[7] There is no indication in the Government's applications that it is seeking to activate or otherwise use GPS on the Target Devices.  Nor is there any indication that the Government seeks to repeatedly place calls to the phones or otherwise track the precise location of the subscribers when the phones are not in use.[8]  The Government's request is for information once it has been stored by the service provider rather than having the cell-site information come directly to the Government.[9]  This court finds that the Government's applications are sufficiently limited as to be within the statutory authorization and constitutional limits.  On this record, "speculation about improper government 'tracking' is premature." *In re Applications of the United States of Am. for Orders Pursuant to Title 18, United States Code, Section 2703(d)*, 2007 WL 2697070, at *3.

---

[7]     It is not entirely clear from the Government's applications whether its requests are limited to cell-site data from a single cellular tower, but a reasonable interpretation of the applications would be to so limit the request because "cell-site information" is defined as "the antenna tower and sector . . .," referring to "tower" in the singular.  (Docket Entry No. 1 at 2 n.3; Docket Entry No. 2 at 2 n.3).

[8]     The Government's applications do request "call-detail records," which it states would include cell-site information used by the phone to obtain service for a call or when in an idle state.  It is a reasonable and likely interpretation of the applications that the request for "call-detail records" relates to historical information. This court concludes that a request for <u>historical</u> cell-site data when the phone is idle does not raise the same concerns as might a request for real-time cell-site data when the phone is idle, because it does not permit the Government to track the subscriber's or customer's current location.

[9]     In a footnote in its applications, the Government notes that its request for cell-site information "after receipt and storage" is "intended to ensure that the information authorized under these paragraphs is information that is first captured and recorded by the provider before being sent to the Investigative Agency."

The Government has made the necessary showing under the statutes and has sought limited information within the statutes' authorization.  The Government is entitled to obtain the cell-site information it seeks, limited to a single antenna tower at one time for: (1) the origination of a call from the Target Device(s) or the answer of a call to the Target Device(s); (2) the termination of the call; and (3) if reasonably available, during the progress of the call. The cell-site data may not be sent directly to the Government, but must be recorded and stored by the cell phone provider first.  The Government may not use or activate any GPS tracking on the Target Devices and may not place repeated calls to the cell phones in an effort to continuously track the location of the subscriber(s) or customer(s) using the Target Devices.  The Government may not obtain prospective cell-site data when the phone is idle, that is, when a call is not being placed or received on the Target Devices.

## III.    Post-Cut-Through Dialed Digits

The Government's applications also seek access to post-cut-through dialed digits.  In the applications now at issue, the Government has indicated that it has informed the Investigative Agency that it must use technology reasonably available to it to restrict the recording or decoding of electronic or other impulses to the dialing, routing, and addressing and signaling information utilized in the processing and transmitting of wire or electronic communications so as not to include the contents of any wire or electronic communication. The Government's applications then state that the Investigative Agency has responded that such technology is not now or foreseeably available.  In a footnote regarding post-cut-

14

through dialed digits, the Government's applications state that to the extent additional digits received are content, the Government will not use such information for any investigative purposes.

Few published opinions have analyzed whether post-cut-through dialed digits may be obtained through a pen register order. In one case addressing this issue, the court denied the Government's request for post-cut-through dialed digits, finding that allowing access to such information would be a violation of privacy unless the Government met the standards for obtaining a wiretap order, which requires a probable cause showing. *See E.D.N.Y. Case*, 2007 WL 2729668, at *8. In that case, the court noted that the Patriot Act had updated the definition of a "pen register" to "'a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted . . . .'" *Id.* at *3 (quoting Patriot Act § 216 (amending 18 U.S.C. § 3127(3))). In addition, the court noted that the Patriot Act added the following statement at the end of the definition: "'provided, however, that *such information shall not include the contents of any communication . . . .*'" *Id.* (quoting Patriot Act § 216 but adding emphasis). The Patriot Act also amended Section 3121(c) to require the Government to use "'*technology reasonably available* to it that *restricts* the recording or decoding of electronic or other impulses to the dialing, routing, addressing, and signaling information utilized in the processing and transmitting of wire or electronic communications *so as not to include the contents* of any wire or electronic communications.'" *Id.* at *4

15

(quoting 18 U.S.C. § 3121(c)) (emphasis added by Eastern District of New York court). The court concluded that there were two specific prohibitions in the Pen Register Statute against the collection of content. *Id.* The court then reviewed Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), and noted that Title III requires the Government to obtain a wiretap order before intercepting the content of an individual's wire communications. *Id.* The court found that the Pen Register Statute was ambiguous because Section 3127 contained a clear prohibition on the collection of content, but Section 3121(c) required the government to use technology reasonably available to restrict the collection of content. *E.D.N.Y. Case*, 2007 WL 2729668 at *5. It was undisputed that post-cut-through dialed digits often include content. The Government had demonstrated that there was no available technology to allow it to separate content from non-content. *Id.* The Government contended that federal law only required it to minimize the collection of content using reasonably available technology, and that if no technology existed to permit it to separate content from non-content, then it was entitled to access to all post-cut-through dialed digits. *Id.* at *2.

The court recognized the contradiction inherent in the statute. "[I]f no content can be collected, then what is the purpose of the reasonably available technology requirement?" *Id.* at *5. The court, however, rejected the Government's position that the upshot was to allow the collection of content because there was no technology available to avoid it. The court emphasized that this approach would make the privacy protection provisions meaningless

16

and raise Fourth Amendment problems by allowing the Government to collect the contents of communications without showing probable cause. *See id.* at *9 (citing *Katz v. United States*, 389 U.S. 347 (1967)). The court concluded that reading the relevant statutes together and in light of the Fourth Amendment limitations, it was required to prevent the Government from obtaining post-cut-through dialed digits without a showing of probable cause. *See id.* at *8. The court held: "Until the Government can separate PCTDD [post-cut-through dialed digits] that do not contain content from those that do, pen register authorization is insufficient for the Government to obtain any PCTDD." *E.D.N.Y. Case*, 2007 WL 2729668 at *13.

Magistrate Judge Smith in this district has also previously considered and denied a request for post-cut-through dialed digits. *See In the Matter of the Application of the United States of Am. for an Order Authorizing (1) Installation and Use of a Pen Register and Trap and Trace Device or Process, (2) Access to Customer Records, and (3) Cell Phone Tracking*, 441 F. Supp. 2d 816 (S.D. Tex. 2006). In that case, the Government acknowledged that there was no technology available that would permit it to separate post-cut-through dialed digits that contained contents from those that did not. *Id.* at 822–23. Judge Smith determined that the Pen Register Statute's proscription against collecting content is unqualified and that the statement in the statute that the Government "shall" use technology reasonably available to avoid collecting contents was a limitation on collecting information, not an authorization to do so. *Id.* at 823–24. The court found that the Government's argument conflicted with the express prohibition against collecting content that was inserted by the Patriot Act. *Id.* at 825.

17

The court concluded: "Post-cut-through dialed digit contents may be intercepted by law enforcement under the Wiretap Act, and collected from electronic storage under the SCA. They are not available to law enforcement under the Pen/Trap Statute. Section 3121(c) is a limitation, not a license." *Id.* at 827.

This court similarly finds that the plain language of the Pen Register Statute precludes obtaining post-cut-through dialed digits when the Government has no means to determine when such information is the content of communications and when it is not and to collect only the information that is not content. The definition of a "pen register" contains an express and clear statement that information collected by a pen register "shall not include the contents of any communication." 18 U.S.C. § 3127(3). The definition of a "trap and trace device" contains a similar prohibition. 18 U.S.C. § 3127(4). The prohibition on the collection of content is clear. Section 3121 contains a general prohibition on pen register and trap-and-trace device use without a court order except as otherwise provided in that section, and contains, under the heading "Limitation," the following mandate:

> A government agency authorized to install and use a pen register or trap and trace device . . . *shall use technology reasonably available* to it that *restricts* the recording or decoding of electronic or other impulses to the dialing, routing, addressing, and signaling information utilized in the processing and transmitting of wire or electronic communications *so as not to include the contents* of any wire or electronic communications.

18 U.S.C. § 3121(c) (emphasis added). The statute requires that a government agency, once it has received authorization for a pen register, use all reasonably available technology to

prevent the collection of content.  Because the definition of a "pen register" specifically excludes the collection of content, the more natural reading of Section 3121(c) is that once the Government obtains authorization to use a pen register (which, by definition, cannot be used to collect contents), it must use all reasonably available technology to prevent collection of content.  The use of reasonably available technology is an added precaution to ensure that the Government does not use an authorized pen register to collect contents.  The Government may not collect content and must use all reasonably available technology to prevent such collection.  The requirement to use "reasonably available technology" is a supplement to the Government's obligation not to collect contents with a pen register.  This interpretation is more consistent with the definition of "pen register" than the Government's argument that if it has technology available to collect electronic and other communications, it is authorized to collect the content of those communications if there is no technology reasonably available to avoid it.

It is instructive to contrast the Pen Register Statute with the Wiretap Act, 18 U.S.C. § 2510 *et seq.*, which contains a provision requiring that orders permitting the interception of wire communications contain a provision that the interception "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter . . . ."  18 U.S.C. § 2518(5).  The Wiretap Act allows the Government to intercept both relevant and irrelevant communications but requires that irrelevant communications be minimized.  *Scott v. United States*, 436 U.S. 128, 140 (1978)

19

("The [Wiretap] statute does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations."). By contrast, the Pen Register Statute expressly prohibits the collection of content and requires the Government, once it has authorization to use a pen register, to use all reasonably available technology so as not to collect the content of communications. Unlike the Wiretap Act, the Pen Register Statute does not contain an obligation to minimize the collection of the content of communications; it contains an affirmative obligation <u>not</u> to collect content in the first place. The Pen Register Statute prohibits the collection of content; it does not authorize the collection of content contained in post-cut-through dialed digits simply because the Government has no reasonably available technology to prevent such collection. Under the clear language of the statute, the Government is precluded from collecting content at all, even if it would be prevented from obtaining some non-content that would otherwise be authorized.

The Pen Register Statute expressly prohibits the collection of content. The Government may not get around this prohibition simply by acknowledging that there is no reasonably available technology to prevent the collection of content. Nor can the Government get around the prohibition by asserting that it will not use any content it collects for investigative purposes. Unlike the Wiretap Act, the Pen Register Statute does not permit the Government simply to minimize the effects of its collection of unauthorized content, but instead prohibits the collection of content in the first place. The Pen Register Statute does

not authorize the Government to collect post-cut-through dialed digits when there is no reasonably available means to prevent the collection of content. If the Government has no means to exclude collecting content when collecting post-cut-through dialed digits, the Government may not obtain such information under the Pen Register Statute. The Government's requests in its pen register applications for post-cut-through dialed digits are denied.

## IV.    Conclusion

Based on the applications, the Government may install and use a pen register and trap-and-trace device to collect cell-site information with respect to a single antenna tower for: (1) the origination of a call from the Target Devices or the answer of a call to the Target Devices; (2) the termination of the call; and (3) if reasonably available, during the progress of the call. The Government may not obtain post-cut-through dialed digits. Separate orders will be entered under seal specifying the details of the pen register and trap-and-trace devices permitted.

SIGNED on October 17, 2007, at Houston, Texas.

Lee H. Rosenthal
United States District Judge